ON July 11 2019 Hall was served a Federal Detainer
For conspiracy To possess with Intent To Distribute
methamphetamine Title 21 USC §§ 846, 841 (a)(1)

ON July 31 2019 Hall appeared Before District Judge
Clifton L Corker and entered a plea OF Not guilty
To Conspiracy To Distribute 50 grams or more
OF methamphetamine Its salts, Isomers and salts
OF Isomers a schedule II controlled substance
IN violation oF Title 21 USC §§ 846, 841 (b)(1)(A)(viii)

Hall argues This court To Issue an order
declaring a categorical policy disagreement with
The purity-Driven methamphetamine sentencing guidelines

0/23

## Discussion

In United States v. Booker, 543 U.S. 220 245 125 S.ct 738, 160 L.Ed.2d 621 (2005) The supreme court held That

The United States sentencing guidelines ("guidelines") are "effectively advisory" and That They "serve as one factor among several courts must consider In determining The appropriate sentence". Kimbrough v. United States 552 US 85, 90, 128 S.ct. 558, 169 L.Ed. 2d 481 (2007) Although advisory, The guidelines remain The "starting point and The Initial Benchmark" For sentencing. Gall v. United States 552 US 38, 49-50, 128 S.ct 586 169 L.Ed. 2d 445 (2007); See also United States v. Millan-Isaac 749 F3d 57, 68 (1st cir 2014) (holding district court's Failure To calculate defendants guidelines sentence range Is "Serious procedural error")

The guidelines cannot be The courts only consideration, however. Gall, 552 US at 49, 128 S.ct 586 The sentencing Court must also consider The sentencing Factors In 18 USC § 3553(a) Including The Nature of the offense The History and characteristics of The defendant and The goals of deterrence and protection of The public

To determine what sentence is "suFFicient, But Not greater Than Necessary." 18 USC § 3553(a) The court must make an "Individualized assessment based on The Facts presented" about whether To vary Upward or downward From The guidelines sentencing range. See Gall 552 US at 50, 128 Sct 586 In doing so The court may not presume That The guidelines range Is reasonable. Id at 49-50 128 Sct 586

District courts are Intitled To vary From The guidelines Sentencing range Not only on The Basis oF Individualized determinations specific To each deFendant, but also on The basis oF a categorical policy disagreement ████ With The guidelines Themselves. The supreme court held In kimbrough That a district court could deviate on policy grounds From 100:1 ratio For crack and powder Cocaine In The guidelines. Kimbrough 552 US at 106-07, 110 128 Sct 558 The court clariFied This holding In spears V. United states 555 US 261 129 Sct 840 172 L.Ed 2d 596 (2009). In spears The supreme court stated That kimbrough recognized "district courts" authority To vary From crack cocaine guidelines based on a policy

2/23

disagreement with Them, and Not simply based on an Individualized determination That They yeild an excessive Sentence In a particular case" Spears 555 US at 264 129 S at 840

The First circuit has Interpreted kimbrough as Empowering a Sentencing court To disagree with guidelines other Than The crack cocaine guidelines That were at Issue In That case. United states v. stone 575 F.3d 83, 89 (1st cir 2009). In Fact a sentencing court commits procedural error IF It Fails To acknowledge Its discretion To vary From The guidelines sentencing range based on a Categorical policy disagreement. Id

The guidelines at Issue here are Those determining a defendant's base OFFENSE level according To The quanity and purity OF methamphetamine Involved See USSG § 2D1.1 (c) (drug quanity Table). Base OFFENSE levels For Federal drug crimes are calculated accordingly To The Drug quanity Table In The guidelines, which uses a graduated scale based on The

Type and quanity OF drugs Involved. see Id
Methamphetamine IS quantiFied based on purity. see id.


The guidelines reFer To three categories OF Methamphetamine
according To relative purity; methamphetamine,
Methamphetamine (actual), and Ice see USSG § 2D1.1 (c)
Notes To Drug Quanity Table (B)-(C) "Methamphetamine"
reFers To gross weight OF a mixture containing a
detectable amount OF methamphetamine (hereinaFter reFerred
To as "methamphetamine mixture") See id. at Notes To
Drug quanity Table (a) "Methamphetamine


(actual)" denotes The weight OF actual methamphetamine
Contained In The mixture (hereinaFter reFerred To as
"actual methamphetamine") See id. at (B. "Ice" means
The weight OF a mixture OF at least 80% purity
Id at (c). The guidelines direct The court To determine
a deFendants Base OFFense level using either The Total
weight OF Methamphetamine mixture or the weight OF The
actual methamphetamine Contained within The mixture,
which ever results In The greater base OFFense level.

See id. at (B)' actual methamphetamine and Ice are Treated Identically under The guidelines, i.e., The same weights of Ice and actual methamphetamine result in The same Base offense levels. See e.g., USSG § 2D1.1(c)(3) (500 grams of actual methamphetamine and 500 grams of Ice both qualify for Base offense level of 34.)

The guidelines establish a 10:1 ratio in Their Treatment of quantities of methamphetamine mixture and actual methamphetamine or Ice. For example, 5 kilograms of methamphetamine mixture, 500 grams of actual methamphetamine, and 500 grams of Ice are all Treated The same way under The guidelines: all receive a base offense level of 34[2] See id.

The government argues, and The court agrees That The 10:1 ratio at Issue here Is not a ratio based on different forms of methamphetamine. Rather The applicable Statues and guidelines distinguish between between different concentrations of methamphetamine In a mixture.

See United States v. Stoner, 927 F.2d 45, 47 (1st cir 1991) (rejecting defendants argument That statue distinguished between "pure" methamphetamine and methamphetamine mixture as different forms of The Drug) In This way. The ratio Imposed by The methamphetamine guidelines Is different From The 100:1 crack cocaine ratio at Issue In kimbrough. While The guidelines distinguish between Two Forms of cocaine (cocaine and cocaine base/crack), They do not distinguish between different forms of methamphetamine. See USSG § 2D1.1(c). Despite The differences between The guidelines governing methamphetamine and cocaine, The government Concedes That - as applied - There Is a 10:1 ratio Between Quantities of actual methamphetamine and methamphetamine mixture That result IN The same base offense level. That 10:1 ratio Is The Focus of _____ motion

_____ argues That This court should Categorically reject, on policy grounds, The 10:1 ratio Between Quantities Of actual methamphetamine and methamphetamine mixture IN The guidelines. a growing number OF District Courts have declared a Categorical policy disagreement

with The purity-driven methamphetamine guidelines
See United States v. Saldana No. 1:17-cr-271-1, 2018
US District Lexis 110790, at *7-10 (W.D. Mich. July 3 2018)
United States v. Hoover No: 4:17-CR-327-BLW, 2018 WL
5924500, at *4 (D. Idaho Nov 13 2018) (Winmill, J)
United States v. Ferguson No: CR 17-204 (JRT/BRT),
2018 WL 3682509, at *3-4 (D. Minn. Aug 2 2018),
United States v. Harry, 313 F. Supp. 3d 969, 974
(ND Iowa 2018) Strand, J.); United States v. Nawanna,
321 F. Supp. 3d 943, 955 (N.D. Iowa 2018)(Bennett J.);
United States v. Ibarra-Sandoval, 265 F. Supp 3d 1249,
1256 (D.N.M. 2017).[2]  This court Finds The
Collective reasoning employed In These decisions
Persuasive and Joins Them By declaring a
categorical policy disagreement with The methamphetamine
guidelines For The Following reasons: (1) There appears
To be No emperical Basis For The sentencing Commissions
harsher Treatment of offenses Involving higher purity
methamphetamine; (2) Methamphetamine purity Is No
longer an accurate Indicator of a defendants role
In a drug-Trafficking Conspiracy; and (3) The
methamphetamine guidelines Create unwarranted sentencing
disparities between methamphetamine offenses and offenses
Involving other major Drugs

## 1. Lack of Empirical Justification

The supreme court has acknowledged That The Sentencing Commission plays an Important Institutional role: "It has The capacity courts lack To base Its determinations on emperical data and national experience guided by professional staff with appropriate expertise" Kimbrough 552 US at 109, 128 Sct 558 (internal quotation marks omitted). In general, The Commission has used Its empirical and experiental approach to develop sentencing guidelines That reflect a fair sentencing range. see id at 96, 109, 128 Sct 558. However, where The guidelines are not The result of The commissions exercise of Its Characteristics Institutional role (reliance on empirical studies and data), The guidelines are a less reliable estimation of a fair Sentence and are Therefore entitled To less deference. See id at 109-10, 128 Sct 558 (holding That district courts Could deviate from crack cocaine guidelines given That Those guidelines did not "exemplify The commisions exercise of Its Characteristic Institutional role")

The commission did not exercise Its Institutional role and rely upon empirical data develop The guidelines To The statutory mandatory minimum sentences That congress established For [drug offenses]" Gall, 552 US at 46 n.2, 128 S.Ct. 586 USSG § 2D1.1 comment 8(A) ("The commision has used The sentences provided In and equivalences derived From, The statue (21 USC § 841(b)(1)), as The primary basis For the guidelines sentences") See also Hayes, 948 F.supp 2d at 1083-25 1027 (reviewing extensive history of methamphetamine guidelines and concluding That They "were crafted by congressional directive and Not precise analysis and empirical research")

The government does not dispute That, In establishing The methamphetamine guidelines, The commision began with congress's mandatory minimums and made No effort To use empirical data To deviate From congress's Judgement. Additionally, many courts have Noted That No empirical data appears To Justify The guidelines 10:1 ratio. See, e.g. Harry, 313 F.supp. 3d at 972-73; Saldana, 2018 US Dist. Lexis 110790, at *4; Hartle, 2017 WL 2608224, at *2 The commision's departure

From Its characteristic Institutional role and the dearth
of empirical data Justifying The 10:1 ratio support This
Court's policy Disagreement with The purity-driven
Methamphetamine guidelines. The government counters
That The real Issue Is not whether The commision
FulFilled Its Traditional Institutional role In Formulating
The guidelines, But whether congress's mandatory minimum
Sentences are correct. The court disagrees. The court
does not have discretion To deviate From The minimum
mandatory sentence established In 21 USC § 841 (b)(1)
But It does have The authority To disagree with The
guidelines promulgated by The commision, especially where
The guidelines at Issue "do not exemplify The commisions
exercise of Its Characteristics Institutional role"
Kimbrough, 552 US. at 109, 128 SCt 558

## 11. Purity as a proxy For Culpability

The assumption underlying The guidelines' higher base offense levels For higher purity drugs Is That purity "Is probative oF The deFendants role or posision In the chain oF distribution." USSG § 2D1.1, comment 27C. In The commentary To The guidelines governing drug oFFenses The commision explained: "since controlled substances are oFten diluted and combined with other substances as They pass down The chain oF distribution, The Fact That a deFendant Is In possession oF unusually pure narcotics may Indicate a prominent In The criminal Interprise and proximately To The source oF The drugs" Id. This rationale provides The JustiFication For The guidelines' consideration oF purity In setting base oFFense levels For some drugs, like methamphetamine. see id.; See also Ibarra-Sandoval, 265 F. Supp. 3d at 1255 (acknowledging That comment 27(C) explains The rationale For purity-Based methamphetamine guidelines); Navanna 321 F. Supp. 3d at 951 (same); Saldana 2018 US. Dist. Lexis 110790. at * 5-6 (Same). For other drugs like heroin, where purity Is not considered In setting The Base oFFense level, This rationale JustiFies an upward departure Based on purity. See USSG § 2D1.1, Comment 27(C)

The assumption underlying The methamphetamine guidelines — That purity Indicates That a defendant Is close To The source of drugs and Therefore played a leadership role IN The conspiracy — Is divorced From current market reality. IN Its 2018 National Drug Threat Assessment, The Drug Enforcement Administration Found That The average purity of methamphetamine Between 2012 and 2017 was over 90% Indeed The average purity of Methamphetamine sampled In 2017 was even higher at 96.9% Id The government does not dispute These statistics. IN Fact, Counsel For The government does not dispute These statistics. IN Fact, Counsel For The government Noted anecdotally That his own experience would corroborate The Fact That The average purity of New Hampshire methamphetamine Is over 90%

average methamphetamine purity has Not always Been This high Between The 1980's and 2007 The average purity of methamphetamine Fluctuated between approximately 30% and 80% Consequently, at one Time The guidelines harsher Treatment of higher purity methamphetamine was more grounded In Fact. See Nawanna 321 F. Supp 3d at 951 (Noting That There was once some Truth To The

assumption That high purity Indicates greater Culpability) Now, however That Is no longer The case due To The consistantly high average purity OF methamphetamine.

In The current market The purity OF methamphetamine does not necessarily reflect a defendants role In The distribution Chain. Low level street dealers are Just as likely as so called "king pins" To have access To and To be charged with distribution of extremely pure methamphetamine. In effect Then The purity-Based methamphetamine guidelines are Treating all defendants as king pins even Though That Is Not Necessarily True. See, e.g. Saldana, 2018 US Dist. Lexis 110790, *9. (Explaining That guidelines "subject all defendants To harsh Treatment, regardless of a particular defendants role and regardless of any scoring Enhancements already accounting For a defendants role In The offence") United States V. Ortega No. 8:09CR400, 2010 WL 1994870, at *7 (D Neb May 17 2010) ("The [10:1] ratio illogically skews sentences For 'average' defendants To The Upper end of The sentencing spectrum, Blurring The distinctions Between high and low level distributors In a hierarchy")

Indeed The government agreed That, due To The high average purity OF methamphetamine essentially every methamphetamine will be charged as Involving actual methamphetamine rather Than a methamphetamine mixture The harsher Treatment oF Nearly all deFendants ON one Factor – purity – obscures other Factors and ~~Creates~~ Creates "False uniFormity". CF United states v. Cabrera 567 F. Supp 2d 271, 273 (D Mass. 2008) ("False uniFormity occurs when we Treat equally Individuals who are not remotely equal because we permit a single Consideration like drug quantity, To mask other Important Factors") For These reasons, The court Concludes That The purity OF methamphetamine Is no longer an accurate Indicater oF Culpibility and The court agrees with Those Courts That have expressed a policy disagreement with The purity driven methamphetamine guidelines. See Nawanna, 321 F. Supp. 3d at 951-54; Saldana 2018 US Dist Lexis 110790 * 8; Ferguson 2018 WL 3682509, at 4; Ibarra - Sandoval 265 F. Supp. 3d at 1255; Hartle, 2017 WL 2608221, at * 3-4

## III UNWarranted Sentencing Disparities

methamphetamine offenses receive more severe sentences than any other drug. See Nawanna 321 F.supp. 3d at 953-54 (reviewing sentencing Commission's 2017 statistics regarding methamphetamine sentences.) The average length of imprisonment for methamphetamine offenders in 2017 was 91 months, higher than for any other drug including heroin. Id at 953. This disparity in sentencing between methamphetamine and other drug offenses arises from the fact that the guidelines provide higher base offense levels for actual methamphetamine than from other comparable drugs. The guidelines' higher base offense levels for actual methamphetamine combined with the ubiquity of high purity methamphetamine in the market result in more severe sentences for methamphetamine offenders

By way of Illustration, 500 grams of actual methamphetamine earns a base offense level of 34 while the quantities of other drugs result in lower base offense levels: Fentanyl (30) Cocaine base (crack) (30) heroin (26) and Cocaine (24) See USSG § 2D1.1(C). By contrast, the base offense level for 500 grams of methamphetamine mixture Is 30 - a level more comparable to that advised for the quantity of other major Drugs. See Id.

Comparable To That advised For The same quantity OF Other major Drugs. See id.

These disparities IN Base offense levels result IN Corresponding disparities IN guidelines sentence ranges. as a hypothetical, consider a defendant convicted OF distributing 500 grams of a controlled substance. Assuming only a *Three* level decrease For acceptance OF responsibility and a criminal History category of V. The Following guidelines sentence ranges would result:

The government agreed at the hearing That actual methamphetamine Is penalized more severely by weight Than any other major Drug. at least one other court has noted That No emperical evidence supports This harsher Treatment OF actual methamphetamine as compared To other drugs. see Harry, 313 F. Supp. 3d at 973. The government provided no such evidence IN This case. For all These reasons *This Court Finds That The guidelines' harsher Treatment OF actual methamphetamine as compared To other drugs is unsupported by empirical data* and runs contrary TO The "Need To avoid UNwarranted Sentencing Disparities among defendants With similar records who have Been Found guilty OF Similar Conduct 18 USC § 3553(a)(6)

## IV procedure To Implement Categorical policy disagreements

For The reasons discussed above, The court disagrees as a matter of policy with The purity-Driven 10:1 disparities Between The calculation of Base offense levels using The weight of actual methamphetamine versus The weight of methamphetamine mixture. The court agrees with Those courts That have expressed This disagreement by recalculating The Base offense levels For methamphetamine offenses more In line with Those of comparable drug-Trafficking offenses This approach will also remove The purity enhancement Now present In all methamphetamine cases due To The high average purity of methamphetamine.

a critical question remains: how Best To Implement This policy disagreement? while The supreme court has laid out a Two-step process For sentencing, see Gall, 552 US at 49-50, 128 SCt 586 Millan Isaac, 749 F.3d at 66 It has not yet made clear how a sentencing Judge should Impliment a categorical policy disagreement with The guidelines. By way of Brief summary, The Two-step process Is as Follows: First a sentencing court court starts By correctly calculating The guidelines

Sentencing range. Gall 552 US. at 49, 128 S.ct 586.
The First step provides The "Initial benchmark" Id.
or "anchor" Peugh v United states 569, US 530, 549,
133 S.Ct. 2072 186 L.Ed 2d 84(2013) at the
second step, a court must make an Individualized
assessment, weighing The factors In 18 USC §3553 (a)
against The prescribed guideline range To reach
a Fair sentence In each case. Gall 552 U.S. at 49-50
128 S.ct 586. The courts central Task Is To
Impose a sentence In ~~that~~ That Is "sufficent
but not greater Than Necessary" To address all The
goals of sentencing 18 USC § 3553(a). Once The Judge
decides on a sentence They must "adequately explain
The chosen sentence To allow For meaningful
appellate review and To promote The perception of
Fair sentencing" Gall 552 US at 50, 128 sct 586

The supreme courts decision In spears provides
some guidance on The question of how Best
To Implement a policy Based variance. In spears,
The court upheld a sentenceing Judge's categorical
policy disagreement with The 100:1 ratio In a
crack cocaine case and use of a substitute

ratio (20:1). Spears 555 US. at 265-66 129 sct 840
The court explained That It Is Not "an exceptable
Sentencing practice" To apply The substitite
ratio (20:1) as part of The sentencing Judge's
Individualized assessment made under § 3553(a)
Id. at 266 129 sct 840. Indeed, The court described
such an approach as a Judge "masking" Their policy
disagreement as an Individualized determination —
which The court characterized as "Institutionalized
~~subterfuge~~ subterfuge" Id

To accomplish The Transparency required of The
Sentencing process, The court should, Therefore, avoid
a procedure that collapses Its policy disagreement
Into Its Individualized determination. adding a seperate
analytical step Between step one (The calculation
of The guidelines range) and step Two (The
Individualized assessment under § 3553(a)) will
address This concern. specifically after
Calculating The guidelines at step one. The court
will, at the next step, recalculate The guidelines
using The Base offense level For the
methamphetamine mixture guidelines Maximum Transparency

Is acheived IF This second step occurs beFore
The Individualized assessment at the Third and
Final step.

This New Three step process makes since based
on the nature OF the court's policy disagreement
here The court disagrees with the purity-driven
ratio used To calculate a deFendants Base
oFFense level IN methamphetamine cases.
This disagreement will exist IN every case where
The step-one calculation oF the base oFFense level Is
made using The actual methamphetamine guidelines
ratio (10:1). The disagreement will Take The Form oF
a policy-Based Variance That Is wholly Independent
oF The Individual deFendant's unique circumstances
and characteristics. IN short every application
oF The policy disagreement would result IN
a policy-Based Variance Independently and
seperately From Its consideration oF a deFendants
Individualized characteristics.

accordiungly, The court will use The Following
Sentencing methodology IN all actual methamphetamine
and Ice cases. (i)

Calculate The guidelines sentencing range using The purity-driven methamphetamine guidelines; (2) recalculate The guidelines using The base offense level For the same quantity of methamphetamine mixture; and (3) evaluate whether any upward or downward variances are appropriate based upon The Individual characteristics of The defendant and The other § 3553(a) factors. The court will apply This approach In all actual methamphetamine and Ice cases reguardless of whether the defendant request The court to do so.

Other district courts have adopted This same Three-step approach. See Harry, 313 F. Supp. 3d at 974 (rejecting court's own prior "ad hoc" approach To applying policy disagreement and declaring That It would In all actual methamphetamine and Ice cases, engage In a seperate analytical Step To determine The guidelines range Based on methamphetamine mixture guidelines); Saldana 2018 US Dist Lexis 110790 at *11 ("The court's methodology For sentencing ~~in~~ IN methamphetamine cases Will be To Treat all methamphetamine quantities

as mixtures.") See also United States v. Gully 619 F.supp 2d 633 644-45 (N.D. Iowa 2009) (adopting Three step sentencing analysis to Implement policy disagreement with crack-powder cocaine guidelines); Michelman, Doing kimbrough Justice supra at 1105 N.79 (collecting cases That Implemented policy disagreement with guidelines by adding Intermediate analytical step Between The Two step Identified In Gall).

The government urges The court Not To apply a categorical policy disagreement In all methamphetamine cases For several reasons First It argues That It will engender Intra-district disparities In sentencing In methamphetamine cases However The supreme court rejected The same argument In kimbrough See kimbrough 552 US at 107-08, 128 S ct 558. The court observed That although uniformity remains "an Important goal of Sentencing" some departures From uniformity are a "Necessary cost" of The courts ruling That The guidelines are merely advisory and Its recognition of district courts discretion over sentencing

Id It Further Noted That Variations among district courts are "constrained by The mandatory minimums Congress prescribed" Id at 108 128 Sct 558

Second The government contends That The court's application of This policy disagreement In all methamphetamine cases will make It more difficult for the government to administer a coherent policy regarding sentencing departures under USSG § 5K and Negatively Impact a defendants Incentive To accept responsibility and/or plead guilty. Those Issues, However, are Not For the court To resolve The courts role Is to Impose a Fair and Just punishment IN every case